## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **NATRAN REZENE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **HARIBO OF AMERICA, INC., MICHAEL** | ) | **CASE NO. 4:24-CV-00759-ALM** |
| **BEST & FRIEDRICH LLP,  AND HARIBO** | ) | |
| **HOLDING GMBH & CO. KG,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

### SECOND AMENDED COMPLAINT

Plaintiff Natran Rezene, by and through her counsel, files this, her Second Amended Complaint, and complains of HARIBO Holding GmbH & Co. KG, HARIBO Of America, Inc., and Michael Best & Friedrich LLP. Plaintiff brings causes of action for discrimination in employment under Title VII based on race and sex (42 U.S.C. § 2000e-2 and § 21.051 of the Texas Labor Code), under the Americans With Disabilities Act (29 U.S.C. § 791, et. al.), retaliation under Title VII and § 21.055 the Texas Labor Code, racial discrimination under 42 U.S.C. § 1981, hostile work environment, defamation and defamation *per se*, intentional infliction of emotional distress, and malicious prosecution. To support her causes of action, Ms. Rezene alleges as follows:

### I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367. This Court has diversity jurisdiction under 28 U.S.C. § 1332 (a) because: (1) there is complete diversity of the defendant and plaintiff, (2) the discriminatory acts complained of herein occurred while Plaintiff resided at all times in Flower Mound, Texas, (3) Plaintiff is a Texas resident and (4) the amount in controversy herein exceeds $75,000.

2.     This Court has personal jurisdiction over HARIBO Holding GmbH & Co. KG ("HG") because HG has subjected itself to suit in Texas by entering into an employment agreement with a United States Citizen and Texas resident. Further, this dispute arises from Ms. Rezene's employment with HG and HARIBO Of America, Inc. ("HOA").

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted occurred in this judicial district.

## II.    PARTIES

4.     Natran Rezene is an individual and resident of the State of Texas. She is an African American woman born in Ethiopia and naturalized as a United States citizen. Prior to the conduct described in this Complaint, Ms. Rezene had been diagnosed with ADHD.

5.     HOA is a subsidiary of HG. HOA is an Illinois corporation with its principal place of business located 9500 Bryn Mawr Avenue, Suite 700, Rosemont, Illinois, 60018. HOA has been served and has entered an appearance through its counsel.

6.     HG is a German company and the parent-company of HOA. HG may be served through the Hague Service Convention by serving the Federal Office of Justice for the Republic of Germany.

7.     HOA and HG are together referred to herein as "HARIBO."

8.     Michael Best & Friedrich LLP ("MBF") is an Illinois limited liability company with its principal place of business located at 790 N. Water Street, Suite 2500, Milwaukee, Wisconsin, 53202. MBF has been served and has entered an appearance through its counsel.

## III.    BACKGROUND AND FACTUAL ALLEGATIONS

### A.  Ms. Rezene's Professional Background

9.     Ms. Rezene is a dynamic professional with a vast range of experiences in

marketing, branding, merchandising, and operations.

10.     Ms. Rezene began her career with Wal-Mart Stores, Inc. in 2005.

11.     In 2013, Ms. Rezene took on the role of Associate Buyer for Sam's Club, a Wal-Mart related company. She thrived and rose to Buyer by 2016.

12.     In 2017, Ms. Rezene accepted a position as Buyer at Gamestop.

13.     In her role at Gamestop, Ms. Rezene managed a $500 million purchasing budget for the company.

14.     She was instrumental in growing Gamestop's audio business by over 85% in 2018, and increased vendor support on marketing by more than $1 million each year with Gamestop.

15.     In 2019, Ms. Rezene became the Director of Marketing & Category Management at Core-Mark.

16.     Her duties included managing more than $1 billion in sales and marketing.

17.     She managed over 80 brands and suppliers across the company's divisions and was responsible for expanding the company's market share among its core target customers.

### B.  HOA's Hostile Environment and Culture

18.     HOA is a work environment where associates are demeaned, overlooked, undermined, discriminated, harassed, devalued, overworked, coerced, and ultimately terminated or made to leave HOA's employ.

19.     While HOA has written policies, neither associates, management, nor senior management conduct business according to those policies.

20.     In fact, former and current HOA employees reported that HOA senior management routinely replaced black employees with white ones when German leadership visited the United States.

21.     In other instances, white employees commented that black employees matched the black Halloween decorations around the office.

22.     During meetings, senior management would argue contentiously, and in some instances, it would lead to physical altercations.

23.     At least one employee reported to Human Resources ongoing sexual relations between senior management and subordinates. And other employees reported allegations of sexual harassment by senior management, including Rick LaBerge.

24.     In other instances, employees were asked to falsify records to meet senior management approval or face retaliatory consequences. HOA motivated and, sometimes, expected employees to directly contradict HOA's policies related to third-party contractor bids.

25.     In those instances, Human Resources took no action.

### C.  HOA Recruits Ms. Rezene

26.     In early 2020, HOA's senior leadership attended the NCA Conference in Miami where Wes Saber, the CFO of HOA, Rick LaBerge, the CCO, and Steven Bauer, the Senior Vice President of Sales, approached Ms. Rezene about an opportunity with HOA.

27.     Quickly noticing her talents, Mr. Saber asked Ms. Rezene if she would be interested in leading a team to open HOA store fronts in the United States.

28.     After COVID lead to a nationwide government shutdown, HOA decided not to pursue opening store fronts and the recruiting efforts stalled.

29.     In 2021, again at the NCA Virtual Conference, Mr. Saber attended an event where Ms. Rezene was a speaker.

30.     Still impressed with Ms. Rezene's credentials and professionalism, Mr. Saber asked Mr. Bauer to recruit Ms. Rezene for a position with HOA.

31.    Mr. Bauer later met with Ms. Rezene and asked her to consider a position on his team.

32.    After interviewing with members of HOA's senior leadership, Ms. Rezene was offered the position as the Head of Sales Development.

33.    Although HOA had other positions titled as "Head of Sales," those positions employees managed specific customer accounts while Ms. Rezene's position was created to assist Senior Vice President of Sales Katie Waller.

34.    Babatu Short, the Vice President of Human Resources, told Ms. Rezene the "Head of Sales Development" position was similar to a Director role with HOA.

35.    Nonetheless, senior management simply recruited Ms. Rezene for her looks— black and attractive.

36.    According to HOA, "our associates are our most valued asset."

37.    HOA believes its "associates are not just partners in our progress but also the most critical factor in transforming our vison and goals to reality."

38.    Based on HOA's stated beliefs, among other things, Ms. Rezene and HARIBO entered that certain Employment Agreement dated June 18, 2021 (the "Agreement").

39.    While the Agreement was purportedly between Ms. Rezene and HOA, Hans Guido Riegel, President of HG, signed the Agreement, indicating Ms. Rezene not only was employed by HOA, but by HG.

40.    Under the terms of the Agreement, Ms. Rezene would serve as the Head of Sales Development for HOA.

41.    One of Ms. Rezene's obligations was to use her best efforts to promote the success of HOA, and in exchange, HOA agreed to pay Ms. Rezene a base salary of $165,000.00 per year,

pay her a signing bonus of $40,000.00 to be paid out over one year from her start date, and to provide other benefits such as health and paid time off. In addition, Ms. Rezene was eligible for an annual bonus.

### D.  Ms. Rezene Begins at HARIBO

42.     Ms. Rezene started her position as Head of Sales Development on July 19, 2021.

43.     Mr. LaBerge and Mr. Saber asked Ms. Rezene to ack as an outside consultant during her first 90 days.

44.     They both asked Ms. Rezene to observe HOA's business operations and identify areas of strength, weakness, deficiencies, and required improvement in HOA's business practices.

45.     During the 90-day observation period, Ms. Rezene quickly identified multiple deficiencies in the Sales Team's processes, and communicated her findings to the senior leadership, including Mr. Saber and Mr. LaBerge.

46.     As part of her 90-day report, Ms. Rezene reviewed HOA's customer contracts and discovered that HOA's customer contracts varied across customers, without consideration of HOA's operation costs.

47.     For example, Ms. Rezene notified senior leadership that the terms of its contract with Target, Inc. required HOA to fill purchase orders and prepare those orders at HOA's warehouses for shipping, while its agreement with other big box-clients did not burden HOA with that obligation.

48.     Ms. Rezene warned senior leadership that not only did the terms of the Target agreement place an additional burden on HOA, but the terms of the agreement could also serve as the basis for other retailers to demand HOA fill and prepare their purchase orders for shipment.

49.     Moreover, the terms of the agreement with Target increased HOA's labor costs

and lead to ongoing delays in the fulfilment of orders and shipments to other customers.

50.     In the 90-day report, Ms. Rezene also suggested that HOA create a uniform process for the negotiation of sales agreements and structured training program for sales associates to ensure customer contracts were aligned across customers.

51.     Additionally, Ms. Rezene was asked to lead the development of a new Business Resource Group to create a structure and process for developing and executing Diversity, Equity & Inclusion goals.

52.     Little did Ms. Rezene know, her objective and honest assessment was not a welcome finding by Ms. Waller and Mr. LaBerge, who believed the findings were insulting because they came from a black woman.

53.     In fact, on December 16, 2021, just 6 months into her employment with HOA, Ms. Waller attempted to demote Ms. Rezene and informed her that the projects she worked on during her first 6 months were not subject to year-end review.

54.     Nonetheless, in Ms. Rezene's "review" in February 2022, Ms. Waller indicated Ms. Rezene had not met expectations, despite similarly situated non-black employees were not given review a per HOA's unwritten policies.

55.     During that same review, Mr. Short criticized the work Ms. Rezene had done on the Business Resource Group project.

56.     Ms. Waller and Mr. Short ultimately concluded Ms. Rezene had not met expectations for her first 6 months.

57.     HOA did not meet its shipment goals for the 2021 Christmas Holidays and 2022 Valentine's Day.

58.     In January 2022, Ms. Waller asked Ms. Rezene to determine why there was a

backlog in the shipment of goods to customers, totaling approximately $50 million.

59.     Three days later, Ms. Rezene identified the issues and learned the new SAP System to determine what created the backlog on deliveries, including the lack of uniformity in HOA's customer agreements, purchase order processing, and weekly prioritization.

60.     Specifically, Ms. Rezene determined that to maintain the appearance HOA was meeting customer order fill-rates, HOA associates were instructed by senior management to cancel customer purchase orders so that it appeared to HG that HOA was operating at a high rate of efficiency when in actuality, it was barely meeting 30-50 percent of the customers' total purchase orders.

61.     After identifying the cause of the backlogs, Ms. Rezene developed a new process that helped HOA eliminate the shipment backlog within 12 weeks and meet its delivery goals for all Easter Holiday shipments, including properly reporting the actual purchase orders and HOA's correct order fill-rate.

62.     As a result of her work, Ms. Rezene's mentor, Khaled Mohsen Ali, Senior Finance Director, told her she was making a substantial impact at HOA.

63.     In February 2022, Ms. Rezene successfully launched the Business Resource Group.

64.     As the lead for the new Business Resource Group, Ms. Rezene believed she was in a position to ensure equal treatment for all employees.

65.     But that belief drained away in April 2022, when a black associate complained to her about Melanie Fleiss, a white Director of Human Resource employee who repeatedly used the word "lynched" during meetings with black associates.

66.     Ironically, the black associate was also a member of the Human Resources team.

67.     Ms. Rezene advised the black associate to report the incident to Human Resources, which he did.

68.     When that black associate reported the issue to Mr. Short, Mr. Short told the black associate that Ms. Fleiss, although she had lived in the United States for more than 10 years, attended college in the States, worked in the human resources field for more than 10 years, and was then employed as a Senior Director of Human Resources at HOA, did not understand using the term "lynched" on multiple occasions in relation to consequences for a black associate's work product was problematic.

69.     Two days after the black associate reported Ms. Fleiss' conduct, the investigation was complete, and Ms. Fleiss was told to apologize to the black associate.

70.     Yet again, instead of taking appropriate action to remedy the complaint, HOA subsequently removed Ms. Fleiss from her position as Senior Director of Human Resources and promoted her to Senior Director Consumer Care & Marketing Projects.

71.     The black associate, however, was constructively discharged.

72.     In addition to her comments to black associates, Ms. Fleiss was often the subject of numerous complaints, including claims she told an employee to work out if she was not pregnant and suggested that an employee who is a single mother was immoral.

73.     In May 2022, while working on a significant price-increase project, Ms. Rezene attempted to present her findings during the company meeting.

74.     During that meeting, Lucia Sandoval-Carrizales, Senior Finance Director, insultingly asked Ms. Rezene whether she had ADHD.

75.     The other employees laughed, as Ms. Rezene confirmed she did in fact have ADHD.

76.     In June and July 2022, Mr. Saber asked Ms. Rezene to work on Phase 2, Thirteen Year Portfolio Planning.

77.     In September 2022, Ms. Rezene presented her analysis and conclusions, which were roundly accepted.

78.     In fact, based on Ms. Rezene's plan, Mr. Saber approved and authorized the Director of Corporate Operations-Engineering to purchase equipment for a second factory in the United States.

79.     Despite proving she was not just a partner, but also critical in transforming HOA's vison and goals to reality, her many successes in 2022, and senior level executives' compliments on her work, Ms. Rezene was demoted to Senior Business Development in December 2022, while other similarly situated employees were not subject to demotion.

80.     And to add insult to injury, she was asked to take on the workload of the Vice President of Sales, a position senior to her prior role as Head of Sales Development.

81.     Later in February 2023, the sales team had a meeting in Arizona. Ms. Rezene was not informed of the meeting and was only permitted to attend after approaching her new supervisor, a white man named Chris Avery, the Vice President of Sales.

82.     During the meeting in Arizona, Tony Fontana, a director of HOA, while at a restaurant with other employees, asked the waiter to bring a cake to Mr. Avery and Mr. Short, while telling the waiter the men were "gay."

83.     Mr. Fontana then called Mr. Short and Mr. Avery "gay" and told the waiter that it was Mr. Short and Mr. Avery's anniversary.

84.     Mr. Short, the subject of the "joke," laughed amusingly with the other mostly white employees.

85.     Ms. Rezene was not amused and her disgust with Fontana's conduct was readily apparent for Mr. Avery and Mr. Short to notice.

86.     Notably, even though HOA allegedly did an investigation into Ms. Rezene's claims stemming from the "gay" joke, neither Mr. Fontana, Mr. Short, nor Mr. Avery were reprimanded, and in fact, Mr. Fontana was recently promoted to Director of the Sales Group.

87.     In the Associate Handbook, "[a]ssociates who believe they have experienced or witnessed any type of discrimination or harassment must notify Human Resources or any member of management."

88.     According to the Associate Handbook, "all associates have the responsibility to report direct and indirect inappropriate statements and/or actions to a Human Resources representative, in good faith."

89.     Fearing Ms. Rezene would report the incident as required by HOA's Associate Handbook, Mr. Fontana and Mr. Avery began a critical onslaught to diminish Ms. Rezene's work.

90.     To seek guidance about her ongoing treatment, Ms. Rezene consulted her HOA assigned "mentor," Mr. Ali on March 9, 2023.

91.     Mr. Ali suggested Ms. Rezene wear more clothes like her "pink suit" she wore at the sales meeting in Arizona.

92.     According to Mr. Ali, "few people would remember what others were wearing but you will stand out—that's the type of impact you want to have in the business life."

93.     On March 10, 2023, Mr. Avery contacted Ms. Rezene to tell her she had exceeded expectations for 2022, after discussing her performance in 2022 with Mr. LaBerge AND Khaled Ali.

94.     But even after exceeding expectations, Ms. Rezene was given a 2% raise and a

1% inflation bump, while others, including similarly situated male and white employees, were given the standard 4% raise and 3% inflation bump.

95.      After being passed over for substantive projects, denied equal pay, told to use her appearance for promotion, and enduring a discriminatory and hostile working environment with no consequences for the bad actors involved, Ms. Rezene believed it was necessary to report the sexual harassment, racial discrimination, and retaliation she endured.

### E.  HOA's Complaint Policies and Ms. Rezene's Claims

96.      According to HOA's Associate Handbook, HOA has a "zero-tolerance policy for harassment."

97.      An employee who believes she has "experienced or witnessed any type of discrimination or harassment must notify Human Resources or any member of management."

98.      Once an employee complains of discrimination or harassment to Human Resources, HOA conducts a "prompt investigation."

99.      After making findings, an employee who has violated HOA's policies is subject to progressively severe consequences, including termination.

100.     In reality, however, HOA operates under a quite different unstated policy.

101.     According to former and present HOA employees, HOA's complaint process was "a mess."

102.     When employees went to Human Resources to complain, they were discouraged by Human Resources directors.

103.     Other former and current HOA employees stated that neither associates nor Human Resources employees received training on how to handle employee complaints.

104.     Moreover, HOA associates did not receive any guidance or training on how to

make complaints that involved Human Resource directors such as Ms. Fleiss and Mr. Short.

105.    Because the persons involved in the discriminatory conduct were the Senior Executives, Directors, and the Vice President of Human Resources of HOA, Ms. Rezene sent her complaints directly to HG's head of legal compliance in March 2023.

106.    HG's head of legal and compliance directed Ms. Rezene to send any "compliance-related topics or serious complaints in connection with your employment at HARIBO of America" directly to him.

107.    Later in March 2023, Ms. Rezene detailed a litany of employment issues, ranging from management and operations to harassment, discrimination, and retaliatory conduct. In her email, Ms. Rezene complained of race and gender discrimination, sexual harassment, mental abuse and intimidation, and retaliation.

108.    Ms. Rezene did this based on HOA's Associate Handbook, which directed employees to report their complaints to "any member of management."

109.    In response to her emails, HG's head of legal compliance told Ms. Rezene HG was "in the process of reviewing theses [stet] matters from a compliance perspective at HARIBO Holding."

110.    Astonishingly, the following day, Mr. Short contacted Ms. Rezene through her personal email to tell her she was on leave, her business email was inoperative, and she should not report to work.

111.    On May 12, 2023, HOA allegedly completed its investigation into Ms. Rezene's allegations, but offered no details or the results, except to suggest there's *nothing here to see*.

112.    On May 12, 2023, HOA terminated Ms. Rezene's employment.

## F.  Defendants File False Police Report

113.    After terminating Ms. Rezene's employment in retaliation for her complaint, HOA engaged MBF to negotiate a release and separation.

114.    During those negotiations, MBF filed a police report with the Rosemont Police Department alleging Ms. Rezene had stolen its computer and other company issued electronics and that she stole the company vehicle.

115.    Despite knowledge HOA had given Ms. Rezene the personal property to do her job, Defendants reported "Natran Rezene stole the company's property described above (the company's vehicle, laptop, monitors, and phone) from … Haribo of America, Inc."

116.    That police report was sent to Flower Mound, Texas Police Department.

117.    Subsequently, two police officers appeared at Ms. Rezene's home to accost her for the alleged theft in the presence of her eight-year-old daughter.

118.    HOA's conduct did not stop there. In fact, in attempts to coerce Ms. Rezene into silence, HOA failed to properly include necessary legal notices in its proposed settlement agreement.

119.    After learning of the police report, Ms. Rezene contacted Rosemont Police Department, Sargeant Piscitelli, who informed her that Defendants implied Ms. Rezene resided in Illinois and absconded to Texas with stolen property, including a stolen automobile.

## G.  EEOC Charge and Right to Sue

120.    On or about November 7, 2023, Plaintiff filed a charge of discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge Number 450-2024-01247.

121.    Plaintiff thereafter requested a Notice of Right to Sue from the EEOC, which was

issued by the EEOC on May 23, 2024. A true and correct copy of the Notice of Right to Sue is attached as **Exhibit A**.

122.    This lawsuit commenced within 90 days of the receipt of the Notice of Right to Sue from the EEOC.

### COUNT I
### Discrimination under Title VII, Civil Rights Act of 1964, as amended, and the Texas Labor Code 21.051 Based on Race (Black) and Sex (Female)

123.    Ms. Rezene repeats and realleges the allegations set forth in paragraphs 1-122 above as if fully set forth herein.

124.    Ms. Rezene has been the victim of unlawful discriminatory conduct in the workplace. Although HARIBO hired Ms. Rezene as a Senior Business Development, she was demoted in December 2022, despite exceeding expectations.

125.    Further, HARIBO, in violation of its own policies, gave Ms. Rezene a 2% raise and a 1% inflation bump, while other non-black employees were given the standard 4% raise and 3% inflation bump, despite the fact she had exceeded expectations for 2022.

126.    Indeed, throughout Ms. Rezene's employment, she was passed over for substantive projects, and when Ms. Rezene finally consulted with her "mentor" regarding the impact on her career, she was told to wear her "pink suit" and use her appearance to get a promotion.

127.    These employment actions are in violation of Title VII, 42 U.S.C. § 2000e-2(a) and § 21.051 of the Texas Labor Code.

128.    Ms. Rezene has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of past and future wages and benefits, as the direct and proximate result of respondent's violation of his civil rights as alleged herein.

129.    Ms. Rezene is reasonably certain to continue to suffer these damages in the future.

130.    Ms. Rezene is entitled to the rights and remedies at law provided by Title VII and the Texas Labor Code including past and future wages, actual damages, compensatory damages, punitive damages, and attorneys' fees.

## COUNT II
### Discrimination Based on Disability
### under the Americans With Disability Act ("ADA")

131.    Plaintiffs repeat and realleges the allegations set forth in paragraphs 1-30 above as if fully set forth herein.

132.    Section 503 of the ADA prohibits discrimination based on disability. Plaintiff is a covered person under the ADA because she was previously diagnosed with ADHD.

133.    In May 2022, while working on a significant price-increase project, Ms. Rezene attempted to present her findings during the company meeting. During that meeting, a Senior Finance Director insultingly asked Ms. Rezene whether she had ADHD. The other employees laughed, as Ms. Rezene confirmed she did in fact have ADHD.

134.    Plaintiff complained of the treatment and harassing behavior, but HARIBO took no steps to remedy Plaintiff's complaint.

135.    Plaintiff has been made to suffer mental anguish and emotional distress because of the insulting and embarrassing incident. As a result of this incident and others, which created a hostile work environment, Plaintiff was constructively discharged.

136.    Plaintiff has suffered loss of employment and future employment opportunities, and loss of past and future wages and benefits, as the direct and proximate result of respondent's violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future.

137.    Plaintiff is entitled to the rights and remedies at law provided by the ADA including past and future wages, actual damages, compensatory damages, punitive damages, and attorneys' fees.

**COUNT III**
**Race Discrimination (42 U.S.C. § 1981)**

138.    Plaintiffs repeat and realleges the allegations set forth in paragraphs 1-137 above as if fully set forth herein.

139.    Plaintiff entered into the Agreement with HARIBO for her employment.

140.    Despite her Agreement with HARIBO, HOA's senior management, including Ms. Waller, Mr. Short, and Mr. Ali, interfered with Plaintiff's Agreement with HARIBO by discriminating against Plaintiff because of her race.

141.    Ms. Waller, Mr. Short, and Mr. Ali's conduct includes, but is not limited to, demoting Plaintiff because she was a white woman who was capable of showing the inefficiencies in their work and processes, failing to give Plaintiff a raise in line with the raise provided to other non-black employees that exceeded expectations, and demeaning and passing over Plaintiff for substantive work projects because of her race.

142.    Ms. Waller, Mr. Short, and others took these steps to interfere with Plaintiff's employment Agreement intentional and with malice.

143.    As a result of these individuals intentional actions, Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of past and future wages and benefits, as the direct and proximate result of respondent's violation of his civil rights as alleged herein.

144.    Ms. Rezene is reasonably certain to continue to suffer these damages in the future.

145.    Ms. Rezene is entitled to the rights and remedies at law provided by 42 U.S.C. §

1981A, including past and future wages, actual damages, compensatory damages, punitive damages, and attorneys' fees.

## COUNT IV
## Hostile Work Environment

146.    Plaintiffs repeat and realleges the allegations set forth in paragraphs 1-145 above as if fully set forth herein.

147.    Plaintiff has been made to endure a racially and gender discriminatory hostile work environment, which lead to her constructive termination.

148.    As described herein, Plaintiff was publicly insulted during meetings at HOA, she was demoted despite recently being hired for a specific role, she was passed over for substantive work, she was in an environment where white employees used racial and discriminatory slurs such as "lynched" when referring to a black employee and "gay" when referring to other employees. Additionally, Plaintiff was objectified by her mentor who stated she should wear her "pink suit" because he believed it would help her obtain a promotion.

149.    These incidents are merely examples of the environment at HOA, which was severe and pervasive before, throughout, and since Ms. Rezene's employment at HOA.

150.    These severe and pervasive instances of race and sex discrimination interfered with Ms. Rezene's ability to do her job.

151.    Moreover, after reporting these issues, Plaintiff was immediately terminated without her knowing and made to communicate directly with one of the bad actors involved in the discriminatory conduct that created a hostile work environment.

152.    Plaintiff has suffered loss of employment and future employment opportunities, and loss of past and future wages and benefits, as the direct and proximate result of respondent's violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer

these damages in the future.

153.    Plaintiff is entitled to the rights and remedies at law including past and future wages, actual damages, compensatory damages, punitive damages, and attorneys' fees.

**COUNT V**
**Retaliation under Title VII and Texas Labor Code § 21.055**

154.    Ms. Rezene repeats and reallege the allegations set forth in paragraphs 1-153 above as if fully set forth herein.

155.    HARIBO committed unlawful employment practices when it retaliated against Ms. Rezene for her efforts to oppose practices reasonably believed to be prohibited by Title VII, in violation of Title VII, 42 U.S.C. § 2000e-3(a) and § 21.055 of the Texas Labor Code.

156.    Specifically, HARIBO, through the actions of Waller and others employed by HOA or as Defendants' agents, individually and in concert with each other, retaliated against Plaintiff by demoting her, denying her a raise despite HOA policies, while simultaneously providing that higher percentage increase in salary to other non-black employees.

157.    Additionally, HOA and its senior management enabled and endorsed a toxic and hostile work environment, where senior management, including senior Human Resources employees dissuaded employees from making complaints, and in some instances, participated in the discriminatory conduct Plaintiff complains of.

158.    Plaintiff has suffered loss of employment and future employment opportunities, and loss of past and future wages and benefits, as the direct and proximate result of respondent's violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future.

159.    Plaintiff is entitled to the rights and remedies at law provided by Title VII and the Texas Labor Code including past and future wages, actual damages, compensatory damages,

punitive damages, and attorneys' fees.

## COUNT VI
## Defamation and Defamation Per Se

160.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-159 above as if fully set forth herein.

161.    Defendants, individually, or together, are liable for defamation and defamation per se.

162.    Despite knowing that Plaintiff did not steal HOA's leased vehicle nor its equipment, which was given to Plaintiff as an employee of HOA, HOA directed defendant MBF to file a false police report, declaring Plaintiff was a thief.

163.    Defendant MBF, although knowing Plaintiff did not steal HOA's leased vehicle or HOA's equipment, filed a false report declaring Plaintiff is a thief.

164.    Defendants knew the statements made to the police were false and made those statements with malice in an attempt to coerce Plaintiff to agree to terms of a release related to her employment with HOA.

165.    The defamatory statements were published with Rosemont Police and also with Flower Mound Police.

166.    Because of the defamatory statements, Plaintiff has been made to suffer mental anguish and emotional distress, presumed damages, reputational damages, and is entitled to punitive damages.

## COUNT VII
## Intentional Infliction Of Emotional Distress

167.    Plaintiffs repeat and realleges the allegations set forth in paragraphs 1-166 above as if fully set forth herein.

168.    Defendants conduct filing a false police report indicating Plaintiff is a thief is extreme and outrageous conduct. Defendants knew the information it reported was false and did so intentionally to coerce Plaintiff to sign a release.

169.    Because of Defendants' conduct, Flower Mound Police went to Plaintiff's home to question her about the alleged theft in the presence of her eight-year-old daughter, leaving Plaintiff anxious and dumbfounded.

170.    Because of Defendants' conduct, Plaintiff has been made to suffer mental anguish and emotional distress, presumed damages, reputational damages, and is entitled to punitive damages.

**COUNT VIII**
**Malicious Prosecution**

171.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-170 above as set forth herein.

172.    Defendants filed a false police report alleging Plaintiff was a thief. Defendants knew the statements in the police report were false, had no probable cause to believe them to be true, and filed the report with malice.

173.    Despite Defendants' conduct, the prosecution against Plaintiff was terminated because it was determined Defendants had filed a false police report. Moreover, Plaintiff was innocent of the alleged theft.

174.    Because of the Defendants' conduct, Plaintiff has been made to suffer mental anguish and emotional distress, presumed damages, reputational damages, and is entitled to punitive damages.

**ATTORNEY'S FEES**

175.    Plaintiff incorporates all the facts and allegations set forth in the preceding sections

21
Second Amended Complaint

as if fully restated herein.

176.    Plaintiff is entitled to recover reasonable and necessary attorney fees under Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and Texas law.

**JURY DEMAND**

177.    Plaintiff demands a jury trial.

**PRAYER**

**WHEREFORE**, Plaintiff Natran Rezene requests that a judgment be entered in her favor against Defendants, jointly and severally, as follows:

(a)    Damages, including back pay, front pay, benefits of employment, actual economic, and mental anguish and emotional distress, for HARIBO's discrimination in violation of Title VII on the basis of race and sex;

(b)    Damages, including back pay, front pay, benefits of employment, actual economic, and mental anguish and emotional distress discrimination in violation of the American With Disabilities Act;

(c)    Damages, including back pay, front pay, benefits of employment, actual economic, and mental anguish and emotional distress for intentional racial discrimination under 42 U.S.C. § 1981;

(d)    Damages, including back pay, front pay, benefits of employment, actual economic, and mental anguish and emotional distress for creating a hostile work environment;

(e)    Damages, including actual economic, and mental anguish and emotional distress for retaliation in violation of Title VII;

(f)    Damages, including actual economic, and mental anguish and emotional distress, and presumed damages, for defamation and defamation per se;

(g)     Damages, including actual economic, and mental anguish and emotional distress for intentional infliction of emotional distress;

(h)     Damages, including actual economic, and mental anguish and emotional distress for malicious prosecution;

(i)     Punitive damages as determined by the jury for Defendants' malicious and intentional conduct under Title VII, 42 U.S.C. § 1981A, et. al., or any other statute of law;

(j)     Reasonable and necessary attorneys' fees and costs under Title VII, 42 U.S.C. § 1981A, et. al., or any other statute of law; and

(k)     Such other relief the as the Court deems just and proper.

**ANOZIE, LLP**

*By: /s/ Nnamdi M. Anozie*
Nnamdi M. Anozie, Partner
Texas Bar No. 24087107
Keron A. Wright, Of Counsel
Texas Bar No. 24075311
6120 Swiss Avenue, #140838
Dallas, Texas 75214
T: 214-606-8780
E: nma@anoziellp.com
E: kaw@anoziellp.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Plaintiff's Second Amended Complaint was filed via the Court's CM/ECF system on this 13th day of May 2025, and served upon Defendants' counsel of record.

By:     */s/ Nnamdi M. Anozie*
Nnamdi M. Anozie